# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 2:17-CR-20074-04-JAR |
| MARTIN CASTANEDA-ONTIVEROS, | |
| Defendant. | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Martin Castaneda-Ontiveros' Motion to Suppress (Doc. 175). Defendant contends that certain wiretaps involving "Target Phones 21 through 29" were obtained by the Government in violation of 18 U.S.C. § 2510, the Fourth Amendment, and applicable case law. The Government has responded (Doc. 187), and the Court held a hearing on July 19, 2019, during which the parties presented arguments. The motion is fully briefed, and the Court is prepared to rule. For the reasons stated below, Defendant's motion to suppress is **denied**.

## I.  Background

As part of an investigation into a drug-trafficking organization, DEA agents obtained authorization to intercept wire and/or electronic communications of multiple cellular phones pursuant to orders signed in the District of Kansas. In total, there were nine orders authorizing thirty-day interception periods. An affidavit prepared by DEA Special Agent David Maguire describing the goals of the investigation in learning about the scope, leadership, and operating locations of the conspiracy supported each wiretap application. The affidavits also explained the need for wiretaps based on the difficulty and lack of success in using other investigative techniques, as explained in further detail below.

Defendant seeks to suppress the fruits of three orders: (1) Target Telephone 21, dated April 6, 2016; (2) Target Telephones 22, 23, and "various and changing phones of 'Primo,'" dated May 9, 2017; and (3) Target Telephones 26, 27, 28, and 29.[1] These orders were signed by U.S. District Judge Daniel D. Crabtree.

On November 30, 2017, Defendant was indicted on five counts in a sealed, thirteen-count Grand Jury Indictment.[2] Defendant was arrested as part of a "take-down" on December 19, 2017. On January 17, 2018, Defendant was charged in a Superseding Indictment, charging Defendant with identical offenses listed in the November 30, 2017 indictment.[3]

## II. Discussion

Defendant challenges the sufficiency of the wiretaps on the basis that the affidavits supporting these wiretaps did not meet the necessity requirement set forth under 18 U.S.C. § 2518(1)(c). Defendant argues that necessity was lacking because (1) the Government had met the objectives of its investigation before applying for the wiretaps and (2) the affidavits did not sufficiently demonstrate that normal investigative procedures had failed or were likely to fail if used. The Government responds that the affidavits established the necessity requirement, and further, Defendant lacks standing to challenge the wiretap of Target Phone 21.

### A. Legal Standard

Under 18 U.S.C. § 2518(1)(c), each wiretap application must include "a full and

---

[1] Docs. 176-1, 176-2, 176-3.

[2] Doc. 1. Defendant was charged in Count I with conspiracy to distribute, and possession with intent to distribute, more than five kilograms of cocaine and more than 100 kilograms of marijuana, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii), (b)(1)(B)(vii), 846, and Title 18, United States Code, Section 2. Counts 8, 9, and 11 alleged the defendant, and others, possessed with intent to distribute more than 500 grams of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(ii), and Title 18, United States Code, Section 2. Count 13 charged the defendant, and others, with money laundering, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

[3] Doc. 42.

complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[4] Additionally, before authorizing a wiretap investigation, a court must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."[5] "Normal" investigative procedures include standard physical and video surveillance, questioning of witnesses and participants in the crime (including through the use of grand juries), executing search warrants, and the use of undercover agents or confidential informants.[6] "This rule is known as the 'necessity' requirement."[7] The purpose of this requirement is to "ensure that the relatively intrusive device 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"[8]

In determining whether a wiretap application is supported by a showing of necessity, a court must consider "all the facts and circumstances" and read the necessity requirement "in a common sense fashion."[9] To meet the necessity requirement, the government need not exhaust all other conceivable investigative procedures before resorting to wiretapping.[10] Rather, if any traditional investigative techniques are not used, the government must explain with particularity why it did not employ these techniques.[11] Once a wiretap application is authorized, the

---

[4] 18 U.S.C. § 2518(1)(c).

[5] 18 U.S.C. § 2518(3)(c).

[6] *United States v. Zapata*, 546 F.3d 1179, 1185 (10th Cir. 2008) (citing *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997)).

[7] *Id.* (citing *United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995)).

[8] *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).

[9] *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002) (citing *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989)).

[10] *Zapata*, 546 F.3d at 1186 (quoting *Edwards*, 69 F.3d at 419).

[11] *Ramirez-Encarnacion*, 291 F.3d at 1222 (citing *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir. 2001)).

defendant bears the burden of proving that the authorization was invalid.[12] "If a defendant succeeds in showing that the necessity requirement was not met, evidence seized pursuant to the wiretap must be suppressed."[13]

To establish standing to challenge the validity of a wiretap application, a defendant must demonstrate that he or she is an "aggrieved person" under the meaning of 18 U.S.C. § 2518(10)(a).[14] An "aggrieved person" is defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."[15] To meet this definition, a defendant must generally show that "(1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises."[16]

**B.     Standing**

As an initial matter, the Government challenges Defendant's standing as to Target Phone 21. Defendant asserts that he has standing as an "aggrieved person" "to the extent he was a party to certain conversations or *referred to in certain conversations* that were recorded on phones 21 through 29, and now those conversations are being or will likely be used as evidence against him."[17] While the Government agrees that Defendant was intercepted or identified as a target subject for Target Phones 22 through 29, the Government asserts that Defendant is not an "aggrieved person" simply because he was "referred to in certain conversations" recorded on Target Phone 21. The

---

[12] *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003) (quoting *Ramirez-Encarnacion*, 291 F.3d at 1222).

[13] *Id.* (citing *Ramirez-Encarnacion*, 291 F.3d at 1222).

[14] *United States v. Donovan*, 429 U.S. 413, 442 (1977) ("Standing to object to intercepted communications is conferred upon '(a)ny aggrieved person,'").

[15] 18 U.S.C. § 2510(11).

[16] *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006) (citing *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990)).

[17] Doc. 175 at 3 (emphasis added).

Court agrees. Defendant was not a party to the intercept, the wiretaps were not directed at him, and the wiretap did not take place on his premises. Merely being "referred to" in an intercept is not sufficient to establish standing as an "aggrieved person." Accordingly, the Court finds that Defendant does not having standing to challenge the intercept to Target Phone 21.[18] Nevertheless, out of an abundance of caution, the Court also considers whether this wiretap application satisfied the necessity requirement.

### C. Goals of the Investigation

Defendant argues that the Government cannot establish necessity because "most of the primary objectives of the government's investigation had been achieved" when the Government applied for wiretaps.[19] The Government responds that "the target subjects were not all federally prosecutable prior to the Court's grant of Title III authority," and thus it had not achieved the legitimate goals of the investigation at the time it submitted wiretap applications.[20] Each affidavit describes the following goals of the investigation:

a. discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of **the Target Subjects** and others unknown;
b. discovering the identities and roles of all suppliers of cocaine, marijuana, and/or other drugs or controlled substances to the conspirators;
c. discovering the identity of the main customers of **the Target Subjects** and others unknown;
d. discovering the stash locations where cocaine, marijuana, and/or other drugs are stored or manufactured prior to distribution;
e. discovering the management and disposition of proceeds generated by the organization's drug trafficking members; and,
f. obtaining admissible evidence that proves beyond a reasonable doubt the **Target Subjects**, and any later identified targets, committed the alleged violations of law set forth herein.[21]

---

[18] Doc. 176-2.

[19] *Id*. at 6.

[20] Doc. 187 at 10.

[21] Docs. 176-1 at 56–58; 176-2 at 54–56; 176-3 at 106–08.

5

Defendant asserts that before the Government had applied for any wiretap orders, it already knew the following: (1) key personnel, (2) the leader was known by name, (3) the scope of the drug distribution network, and (4) the location of stash houses. Defendant also argues that the Government has failed to explain specifically how a wiretap would shed light on the management and disposition of proceeds of the drug trafficking organization. Finally, Defendant points to the fact that the wiretaps at issue came at the tail-end of the investigation, suggesting that the investigation had already run its course. The Government responds that it could not have prosecuted all of the target subjects with the crimes they are now charged with, absent the intercepts, nor had it met the legitimate goals of the investigation when it applied for the wiretaps.

As an initial matter, the Court finds that the objectives of the investigation were not overly broad or illusory. The Tenth Circuit has found that goals similar to those listed in the Government's affidavits are appropriate.[22] Additionally, the Court finds Defendant's assertion that the objectives of the investigation were already achieved at the time of the wiretap applications to be without support. Although the Government certainly knew some of the information, such as some key personnel or stash locations, the wiretaps were permissibly used to further the stated goals of the investigation, including identifying the "*full* scope," "key personnel . . . and *others unknown*," and "identities and roles of *all* suppliers."[23] The standard for assessing necessity is not whether the Government could prosecute some individuals for some crimes; rather, the Court considers whether the objectives were legitimate goals. The

---

[22] *See, e.g.*, *United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011) ("[W]e have held on numerous occasions that the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps."); *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981) (noting that "[t]he FBI was properly concerned . . . with identifying all of the members of the conspiracy, as well as the precise nature and scope of the illegal activity").

[23] *See* Docs. 176-1 at 56–58; 176-2 at 54–56; 176-3 at 106–08.

Court finds that the objectives here were legitimate. Thus, although the Government learned about various aspects of the conspiracy throughout its investigation, the Government did not achieve the objectives of the investigation prior to the wiretap applications.

**D.      Normal Investigative Procedures**

Defendant also argues that the Government failed to adequately show that normal investigative procedures were tried and failed, were unlikely to succeed, or were likely to be too dangerous if tried. Each affidavit the Government submitted contains a section asserting the need for wiretaps and describing the use of normal investigative procedures. These affidavits are detailed and extensive, ranging from 100 to 159 pages in length. The explanations as to the normal investigative procedures are largely similar in each affidavit.[24] Although the Court views the success of normal investigative procedures in totality,[25] a discussion of each procedure described in the affidavits is set forth below.

**1.      Confidential Human Sources and Undercover Agents**

The affidavits described the use of seven confidential informants/sources, as well as an undercover officer, in this investigation prior to the Title III phase.[26] Agent Maguire stated that each confidential informant provided some information[27] but could not provide information regarding the organization's suppliers, stash houses, or distribution efforts because they "have only been able to infiltrate the organization to a certain degree."[28] According to the affidavits,

---

[24] *See United States v. Wright*, 156 F. Supp. 2d 1218, 1225 (D. Kan. 2001) (explaining that such similarities are to be expected in cases involving multiple wiretap applications for phones belonging to one or two parties).

[25] *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002) (citing *Nunez*, 877 F.2d at 1472).

[26] Docs. 176-1 at 58–59; 176-2 at 58–59; 176-3 at 108–11.

[27] Docs. 176-1 at 59; 176-2 at 56; 176-3 at 108.

[28] Docs. 176-1 at 59-60; 176-2 at 57–58; 176-3 at 109–10.

7

one informant conducted a cocaine purchase with a Target Subject, but agents could not locate the Target Subject's stash house or supplier.[29] Another informant coordinated a cocaine transaction with two Target Subjects.[30] Agent Maguire did not believe, however, that the single purchase of marijuana or cocaine provided enough information to satisfy the objectives of the investigation.[31] Ultimately, the Government stopped using all controlled sources, determining the sources, alone, could only infiltrate the organization to a certain degree.[32]

Defendant argues that the Government successfully used confidential sources and that there was no indication their continued use would not have been productive.[33] Defendant notes that the informants provided information on "Pelon," "Primo," and other known co-conspirators, and contends the Government did not legitimately try to access higher-level distributors through an undercover agent.[34] According to Defendant, more controlled purchases and phone calls between informants or agents and Target Subjects could have been successful.[35] Defendant also contends that not all human sources will have limited utility because the Target Subjects were not "extremely exclusive" in their dealings; indeed, the Target Subjects contacted the undercover agent to sell drugs.[36]

The affidavits explain, however, that it is very dangerous for an agent to infiltrate the upper echelons of an organization to learn the scope of the organization's activities.[37] Although

---

[29] Docs. 176-1 at 60; 176-3 at 110.

[30] Docs. 176-1 at 59; 176-2 at 57; 176-3 at 109.

[31] Docs. 176-1 at 60; 176-2 at 57; 176-3 at 110.

[32] *See* Docs. 176-1 at 59–6; 176-2 at 57; 176-3 at 110–11.

[33] Doc. 175 at 8–9.

[34] *Id*.

[35] *See id* at 9–10.

[36] *Id*. at 9.

[37] Docs. 176-1 at 76; 176-2 at 66–67; 176-3 at 120.

the Court recognizes that the informants and undercover agent provided valuable information to the Government, the Court finds that the Government adequately explained the limitations of this investigative technique and the reasons it chose not to continue with the use of confidential sources or an undercover agent.

### 2. Physical Surveillance

The affidavits also described how physical surveillance was of limited utility in discovering the organization's operations.[38] Agent Maguire stated that surveillance could confirm meetings and other suspected criminal activity but not the purpose of those meetings and activity.[39] The affidavits explained that physically surveilling Target Subjects helped agents identify vehicles and potential stash locations used by the organization.[40] At least one of the stash houses however, was located on a dead-end street, making physical surveillance impossible without compromising the agents.[41] Further, the vehicles were registered in fictitious names or names that agents could not confirm.[42] Even when used with other traditional methods, physical surveillance neither confirmed criminal activity nor identified "Pelon," "Primo," or their suppliers.[43]

Defendant argues, however, that physical surveillance was successful in conjunction with other traditional methods.[44] Defendant contends that surveillance was critical in corroborating

---

[38] Docs. 176-1 at 64–76; 176-2 at 60–66; 176-3 at 114–20.

[39] Docs. 176-1 at 64; 176-2 at 60; 176-3 at 114.

[40] Docs. 176-1 at 65; 176-2 at 61; 176-3 at 114.

[41] Doc. 176-1 at 66.

[42] Docs. 176-1 at 65; 176-2 at 61; 176-3 at 114.

[43] Docs. 176-1 at 65–70; 176-2 at 61–66; 176-3 at 114–20.

[44] Doc. 175 at 10.

9

the confidential sources' information and credibility,[45] and continued surveillance, along with other traditional methods, could have been extremely successful.[46] Based on its review of the affidavits, the Court finds the Government adequately explained the limitations of physical surveillance, including failing to identify the purpose of meetings or the identity of many of the conspirators. Further, considering the location of at least one stash house on a dead-end street, the Court is convinced that the continued use of physical surveillance could have compromised the agents.

### 3. GPS Tracking Devices and Pole Camera

The affidavits explained that GPS tracking devices also helped the Government identify potential stash houses.[47] Based on the GPS information, agents then positioned pole cameras to monitor activity at these houses.[48] The cameras, however, did not reveal if "Primo," or others, carried narcotics, weapons, or drug proceeds in and out of the residences.[49] Agent Maguire also stated that the camera's complete lack of sound was a major limitation: agents could only speculate about the activity when viewing surveillance footage.[50]

Defendant states in a conclusory manner that the pole cameras were successful, especially when used with some other traditional methods.[51] Defendant also argues that GPS tracking provided agents with locations frequented by target subjects, and thus the need for

---

[45] *Id.*

[46] *Id.*

[47] Doc. 176-1 at 91; 176-2 at 79–80; 176-3 at 135.

[48] Doc. 176-1 at 91; 176-2 at 79–80; 176-3 at 135.

[49] Docs. 176-1 at 92; 176-2 at 80; 176-3 at 135.

[50] Docs. 176-1 at 92; 176-2 at 80; 176-3 at 136.

[51] Doc. 175 at 11.

10

wiretaps diminished.[52] The Court finds that, while GPS tracking and pole cameras provided some benefit, the Government adequately explained how these traditional methods failed in achieving the investigative objectives.

### 4. Search Warrants

The affidavits explained that search warrants were used to obtain physical location data of cellular telephones used by Target Subjects.[53] Agents believed, however, that executing search warrants on any location associated with the Target Subjects would hinder the investigation.[54] The affidavits emphasized that executing a search warrant prematurely would expose the investigation to the Target Subjects, causing them to flee or drastically change their operations.[55] Agents did execute search warrants on two residences utilized by a known customer of "Pelon;" however, neither search revealed the identity or location of "Pelon," suppliers, other co-conspirators, or stash houses.[56] The affidavits also explained that agents did not have probable cause to search some houses, or with regard to others, did not believe a search would lead to the discovery of any stash locations, sources of supply for the organization, or other co-conspirators.[57]

Defendant argues that search warrants, in conjunction with other traditional methods, could have been fruitful.[58] He asserts there is no factual basis for Agent Maguire to state that search warrants would have limited utility because the warrants could have led to the discovery

---

[52] *Id*.

[53] Docs. 176-1 at 79; 176-2 at 69; 176-3 at 123–24.

[54] Docs. 176-1 at 79; 176-2 at 69; 176-3 at 124.

[55] Docs. 176-1 at 80–82; 176-2 at 69–74; 176-3 at 123–29.

[56] Docs. 176-1 at 80; 176-2 at 69; 176-3 at 124.

[57] Docs. 176-1 at 80; 176-2 at 68–72; 176-3 at 125–26.

[58] Doc. 175 at 11–12.

of stash houses.[59] Defendant also contends that telephone interceptions, alone, would be no more successful than search warrants because "coded" phone conversations are no more valuable than "coded" documents found during search warrants.[60] The Court recognizes that the Government likely could have gained additional information about the conspiracy by executing search warrants on known locations. However, the Court also credits the Government's concern that isolated search warrants might have alerted the organization to the investigation and left the Government with limited evidence as to the larger conspiracy. Accordingly, the Government adequately explained how this traditional method would hinder investigative objectives.

### 5. Trash Searches

The affidavits additionally stated that agents had not conducted trash searches, but that doing so was unlikely to be successful, or worse, would expose the investigation.[61] Agent Maguire explained that a trash search might reveal phone numbers and monikers of some conspirators, or writing about a drug transaction, but based on his experience, training, and knowledge, the searches were unlikely to yield substantial evidence.[62] He further explained that a trash search in this investigation involved a risk of exposure that outweighed the evidence that agents may find from it.[63] The affidavits described how trash searches would be difficult to conduct without raising suspicions because of the location of the houses and trash bins.[64] Further, agents believed "Primo" and "Pelon" were experienced and keen enough not to dispose

---

[59] *Id.*

[60] *Id.*

[61] Docs. 176-1 at 89; 176-2 at 77–78; 176-3 at 133.

[62] Docs. 176-1 at 89; 176-2 at 77; 176-3 at 133.

[63] Docs. 176-1 at 89–91; 176-2 at 77–79; 176-3 at 133–35.

[64] Docs. 176-1 at 90–91; 176-2 at 78–79; 176-3 at 133–34.

of drug paraphernalia at their residences.⁶⁵ Thus, the Government ultimately decided not to jeopardize the investigation by conducting trash searches.⁶⁶

Defendant argues that trash searches at the Target Subjects' houses could elucidate agents on how the Target Subjects used each house as well as provided agents with phone numbers, financial documentation, or drug paraphernalia.⁶⁷ As a result, Defendant contends trash searches are valuable and could have established probable cause for a search warrant unobtrusively.⁶⁸ The Court is satisfied with the Government's explanation as to why it did not use trash searches. Aside from the adequacy of this explanation, the Tenth Circuit has never held that trash searches constitute normal investigative procedures that must be considered by the government before applying for a wiretap.⁶⁹

### 6. Interviews

The affidavits stated that agents interviewed individuals related to the organization but did not interview any close associate of "Pelon" or "Primo."⁷⁰ The affidavits explained that interviewing those associates, or the Target Subjects themselves, would have exposed an on-going investigation and resulted in the possible destruction or concealment of documents and other evidence.⁷¹ The affidavits further explained that no person interviewed provided

---

⁶⁵ Docs. 176-1 at 90; 176-2 at 78; 176-3 at 134.

⁶⁶ Docs. 176-1 at 89; 176-2 at 78; 176-3 at 133.

⁶⁷ Doc. 175 at 12.

⁶⁸ *Id*. at 12–13.

⁶⁹ *See United States v. McDowell*, No. 09-20144-JWL, 2011 WL 830534, at *3 (D. Kan. Mar. 2, 2011) (citing *United States v. Verdin–Garcia*, 516 F.3d 884, 890 (10th Cir. 2008)) ("[T]he Tenth Circuit has not recognized the use of trash pulls as a traditional investigative technique that must be considered before wiretaps become necessary."); *see also United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997) (listing traditional investigative techniques recognized in Tenth Circuit).

⁷⁰ Docs. 176-1 at 85; 176-2 at 74; 176-3 at 129.

⁷¹ Docs. 176-1 at 86; 176-2 at 75; 176-3 at 130.

information relevant to other drug customers or drug suppliers.[72] Defendant argues the Government already knew the close associates, and thus could have completed the investigation quickly by interviewing them.[73] Having reviewed the affidavits, the Court credits the Government's assertion that other interviews were not feasible because they may have exposed the on-going investigation.

### 7. Grand Jury Subpoenas

The affidavits also stated that the Government did not use a Grand Jury investigation and explained the reasons why it would have been unsuccessful.[74] Based on his experience, Agent Maguire explained that Target Subjects, if called to testify, would invoke their Fifth Amendment privileges.[75] Since the Target Subjects were involved in illegal activity, Agent Maguire further explained that they might not be truthful unless confronted with facts forcing them to tell the truth, but that would require revealing what the Government already knew about the organization.[76] According to Agent Maguire, the Grand Jury, at a minimum, would cause the Target Subjects to become more circumspect in their dealings.[77] While the Court acknowledges, as Defendant argues, that the Government does not know for a fact that the Target Subjects would invoke their Fifth Amendment privileges or lie under oath,[78] the Court finds the Government adequately explained why a Grand Jury investigation was unlikely to succeed.

---

[72] Docs. 176-1 at 85–86; 176-2 at 74; 176-3 at 130.

[73] Doc. 175 at 13.

[74] Docs.176-1 at 87; 176-2 at 75–76; 176-3 at 130–31.

[75] Doc. 176-1 at 87; 176-2 at 75; 176-3 at 130.

[76] Doc. 176-1 at 87; 176-2 at 75; 176-3 at 131.

[77] Doc. 176-1 at 87; 176-2 at 76; 176-3 at 131.

[78] *See* Doc. 175 at 13.

### 8. Normal Investigative Procedures as a Whole

Viewing the success and limitations of these normal investigative procedures as a whole, the Court cannot find that Defendant met his burden of establishing the lack of necessity for wiretaps in this case. The necessity requirement does not require the government to exhaust all other investigative techniques before turning to wiretapping.[79] Even so, the Government here used all of the normal investigative procedures that it discussed, except for trash searches, search warrants, and grand jury subpoenas. The Government adequately explained, however, in the affidavits why it did not use each of these techniques.

The Government also provided detailed explanations as to the results of the traditional investigative techniques that it did use. Traditional techniques provided information such as vehicle information, locations of suspected stash houses, identity of some key personnel, and instances of specific drug transactions. As the affidavits demonstrate, however, normal investigative procedures did not reveal the scope of the conspiracy, and the identities and roles of many members of the organization remained unknown even as the wiretap investigation progressed.

This is not a case of the Government failing to address the necessity of wiretaps, or seeking wiretap authorization after using only one or two normal investigative procedures without explaining why it did not use other procedures.[80] To the contrary, the Government spent many pages describing the results of the normal investigative procedures it used, explaining why

---

[79] *United States v. Zapata*, 546 F.3d 1179, 1186 (10th Cir. 2008) (quoting *United States v. Edwards*, 69 F.3d 419, 419 (10th Cir. 1995)).

[80] *See United States v. Mondragon*, 52 F.3d 291, 293–94 (10th Cir. 1995) (reversing district court's finding of necessity because supplemental wiretap affidavit "completely fail[ed] to address the necessity requirement"); *United States v. Castillo-Garcia*, 117 F.3d 1179, 1194 (10th Cir. 1997) (holding that necessity requirement not met because wiretap application relied on conclusory statements and previous investigative techniques were visual surveillance of only two suspects in large conspiracy, and use of background checks, pen registers, and trap-and-trace devices against only few co-conspirators).

it did not use certain procedures, and stating what it knew about the organization during each wiretap period.[81] For these reasons, the Court concludes that the Government met the necessity requirement by providing "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[82]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress (Doc. 175) is **denied**.

**IT IS SO ORDERED.**

Dated: August 19, 2019

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[81] *See United States v. Barajas*, 710 F.3d 1102, 1107–08 (10th Cir. 2013) (affirming district court's finding of necessity where affidavits explained why traditional investigative techniques were ineffective and why other techniques would prove ineffective if tried, and supplemental affidavits included new details learned about drug organization).

[82] 18 U.S.C. § 2518(1)(c).